UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JURIJUS KADAMOVAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00050-WTL-MJD |
| | ) | |
| JOHN CARAWAY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Order Granting Defendants' Motion for Summary Judgment
And Directing Entry of Final Judgment**

Plaintiff Jurijus Kadamovas is a federal inmate currently incarcerated in the Special Confinement Unit (SCU) of the Terre Haute U.S. Penitentiary (USP-TH) in Terre Haute, Indiana. On February 1, 2017, Mr. Kadamovas filed this action again various USP-TH employees alleging that the defendants were deliberately indifference to his serious medical needs of asthma and breathing problems under the Eighth Amendment. Mr. Kadamovas alleges he is exposed to second-hand smoke and chemical fumes, which he says exacerbates his asthma, and the defendants have not sufficiently protected him from exposure to the smoke and fumes. Mr. Kadamovas' action is brought pursuant to the theory recognized in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

On March 3, 2017, counsel was recruited to represent the plaintiff.[1] The Court screened his complaint on March 9, 2017, and allowed his Eighth Amendment claims against John Caraway, Former Warden; Charles A. Daniels; Warden; Micheal L. Stephens, Former Unit Manager;

---

[1] The Court is grateful to Oni N. Harton, Ladene Ivone Mendoza, and John R. Maley of Barnes & Thornburg LLP for accepting the Court's request for assistance and their diligent efforts on behalf of Mr. Kadamovas.

Melissa Bayless, Former Unit Manager; Micheal V. Sample, Unit Manager; Sara M. Revell, Regional Director; Dr. William E. Wilson, Clinical Director; and Andrew William Rupska, Health Services Administrator, to proceed. *See* Dkt. No. 8. The remaining claims and defendants identified in the complaint were dismissed. On August 31, 2017, the parties stipulated to the dismissal without prejudice of the claims brought against defendants Micheal Stephens, Sara Revell, and Andrew Rupska. The Court granted the stipulations of dismissal and dismissed the claims against those defendants. *See* Dkt. No. 51.

On November 13, 2017, Mr. Kadamovas filed an amended complaint, asserting Eighth Amendment claims against John Caraway, Former Warden; Charles A. Daniels, Former Warden; Melissa Bayless, Former Unit Manager; Micheal V. Sample, Unit Manager; Dr. William E. Wilson, Clinical Director; and Jeffrey E. Krueger, Warden. Dkt. No. 59.

Presently pending before the Court is the defendants' motion for summary judgment. For the reasons explained below, the motion for summary judgment, Dkt. No. 92, is **granted**.

## I. Summary Judgment Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable

to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Local Rule 56-1(e) requires that facts asserted in a brief must be supported "with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." *Id.* In addition, the Court will assume that the facts as claimed and supported by admissible evidence by the movant are admitted without controversy unless "the non-movant specifically controverts the facts in that party's 'Statement of Material Facts in Dispute' with admissible evidence" or "it is shown that the movant's facts are not supported by admissible evidence." Local Rule 56-1(f). The Court "has no duty to search or consider any part of the record not specifically cited in the manner described in subdivision (e)." Local Rule 56-1(h); *see Kaszuk v. Bakery and Confectionery Union and Indus. Intner. Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986) ("The court has no obligation to comb the record for

evidence contradicting the movant's affidavits."); *Carson v. E.On Climate & Renewables, N.A.*, 154 F. Supp.3d 763, 764 (S.D. Ind. 2015) ("The Court gives Carson the benefit of the doubt regarding any disputed facts, however, it will not comb the record to identify facts that might support his assertions.").

## II. Factual Background

The following statement of facts was evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Kadamovas as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### A. Mr. Kadamovas' Complaints Regarding Exposure to Smoke and Chemical Spray

Mr. Kadamovas is a federal inmate incarcerated in the SCU at USP-TH. The SCU is the only "death row" in the federal prison system. Dkt. No. 92-2, ¶ 8. Although Mr. Kadamovas has not been evaluated with wheezing or other physical examination findings consistent with asthma, Mr. Kadamovas has been diagnosed with mild persistent asthma and has been prescribed an Albuterol inhaler and other bronchodilators. *See* Dkt. No. 92-3; Dkt. No. 92-4. He also sees an outside pulmonologist each year. Dkt. No. 92-4 at 5, 8. For the past several years, Mr. Kadamovas has complained that he has trouble breathing whenever smoke or chemical gas comes into the SCU through the heating and cooling vents from the Special Housing Unit ("SHU"), which is located directly below the SCU.

1. <u>Use of OC Spray in the SHU</u>

In his complaint, Mr. Kadamovas asserts that he is exposed to oleoresin capsicum (OC)[2] spray fumes when USP-TH staff deploy the spray in the SHU. Mr. Kadamovas does not claim that USP-TH staff members have used OC spray on him. Dkt. No. 92-1[3] at 16-17, 26. Additionally, Mr. Kadamovas recalls that OC spray has only been used twice in the outdoor recreation area of the SCU about three-and-a-half or four years ago but has not been used in the SCU since that time. *Id.* at 17-18.

Rather, Mr. Kadamovas believes that OC spray was used in the SHU approximately thirty times since 2013, including seven times in 2017 and as recently as January 29, 2018. *Id.* at 19-21. Although Mr. Kadamovas cannot smell the gas, he says that the gas spreads to the SCU and he just begins choking when he feels the particles in the air. *Id.* at 25. Generally, when OC spray is used in the SHU, and USP-TH staff can detect it in the SCU, Mr. Kadamovas testified that SCU staff will remove him from his cell and take him to the outdoor recreation area. *Id.* at 20, 21, 62.

Mr. Kadamovas asserts that when he is exposed to OC spray, he is unable to breathe as if someone is choking him from inside, and he starts crying, sneezing, and vomiting. *Id.* at 20.

2. <u>Exposure to Smoke from the SHU</u>

Mr. Kadamovas also alleges that he is exposed to smoke when inmates in the SHU smoke tobacco and other contrabrand, illegally cook food on an open fire, or set fires. *Id.* at 30-33, 39. Mr. Kadamovas asserts that the smoke from the SHU travels to the SCU through the air vents. Mr.

---

[2] Oleoresin capsicum spray or "OC" is a naturally occurring substance found in the resin of a variety of peppers. *See* www.ncjrs.gov/pdffiles1/nij/grant (National Institute of Justice, U.S. Department of Justice, Office of Justice Programs, March 1994). OC spray is also known as pepper spray.

[3] References to Dkt. No. 92-1 refer to the deposition page and not the exhibit page.

Kadamovas acknowledges that inmates in the SCU, where he is housed, do not start fires or smoke in their cells. *Id.* His claims about smoke, as with the OC spray, relate solely to inmates in the SHU, who he believes either smoke or create fires in their cells approximately 15-20 times out of each month. *Id.* at 32-33. In his complaint, Mr. Kadamovas referenced "known firestarters" in the SHU, but in his deposition could not identify any inmates who he believes are "known firestarters." *Id.* at 42. Mr. Kadamovas recalls that a SCU inmate "Sanchez" was caught passing coffee and soups to SHU inmates through the ventilation system, and Sanchez was disciplined when he was caught. *Id.* at 46. For the last two and a half or three years, Kadamovas has been housed on the upper range of the SCU. *Id.* at 12-13. His Unit Manager at the time, Micheal Sample, moved him to the upper range in an effort to address Mr. Kadamovas' complaints about exposure to smoke and OC spray. *Id.* at 13.

Mr. Kadamovas alleges that he is unable to breathe when he smells smoke and he experiences "psychological anguish, vomiting, diarrhea, headache, fear of death, high blood pressure, accelerated heartbeat, significant respiratory stress, wheezing, pain in lungs, and excessive sweating" due to his exposure to gas and smoke. Dkt. No. 96-1 at 5.

### B. Mr. Kadamovas' Medical Treatment

Mr. Kadamovas claims that he developed asthma after he was arrested and incarcerated in the Metropolitan Detention Center – Los Angeles. Dkt. No. 92-1 at 9. When Mr. Kadamovas was received into the custody of the Federal Bureau of Prisons (BOP) in March 2002, his intake medical forms show that he denied having asthma or shortness of breath. Dkt. No. 92-4 at 1.

On July 25, 2013, Mr. Kadamovas was seen during sick call regarding complaints of breathing problems. *Id.* at 2. However, his lungs were clear, his vitals were normal, and he appeared alert and well with no acute distress. Nonetheless, the practitioner prescribed him an Albuterol inhaler. *Id.*

In 2014, Mr. Kadamovas was seen nine times by medical staff for his complaints about trouble breathing. *Id.* at 2-3. Each time he was evaluated, his vitals were normal, his lungs were clear, and he was in no acute distress. *Id.* During these visits, Mr. Kadamovas did not exhibit any chest crackling or wheezing. *Id.* In May 2014, his medical provider recommended trying Singular, Zantac, and Loratidine. *Id.* at 2. In November 2014, Dr. Wilson and the medical staff requested a consult with an outside pulmonologist, but the Utilization Review Committee (URC) did not grant the request. *Id.* at 3.

In 2015, Mr. Kadamovas was seen three times by medical staff for complaints of trouble breathing. *Id.* at 4-5. Again, when evaluated by medical staff, his vitals were normal, he was in no apparent distress, and his respiration was normal. *Id.* In October 2015, Mr. Kadamovas requested a CT scan of his chest, but due to a recent unremarkable chest x-ray (CXR), *see* Dkt. No. 92-6 at 13, medical staff noted that a CT scan was not clinically indicated. Dkt. No. 92-4 at 4. Nevertheless, in December 2015, Mr. Kadamovas received a CT scan, and his lungs showed no evidence of local infiltrate or pleural effusion.[4] *Id.* at 5. Nevertheless, the USP-TH medical staff placed a note in Mr. Kadamovas' medical file to restrict the use of chemical gas on Mr. Kadamovas. Dkt. No. 29-6 at 40.

In 2016, Mr. Kadamovas was seen five times by medical staff for shortness of breath. Dkt. No. 29-4 at 5-7. On January 28, 2016, Mr. Kadamovas did not complain or show signs of respiratory distress, but again requested a pulmonary consult. *Id.* at 5. The practitioner explained that his request had been submitted and rejected by the URC. *Id.* On February 12 and 22, 2016,

---

[4] Pleural effusion is the build-up of excess fluid on the lungs.
https://my.clevelandclinic.org/health/.../17373-pleural-effusion-causes-signs. Local infiltrate is a substance denser than air, such as puss, blood, or protein, which lingers within the parenchyma of the lungs. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3218724.

Mr. Kadamovas was seen by a registered nurse for complaints of shortness of breath, but his lungs were clear and his vitals were normal. *Id.* Mr. Kadamovas was then seen by Dr. Wilson on February 25, 2016, for his complaints of shortness of breath. *Id.* Dr. Wilson found his lungs clear and questioned whether Mr. Kadamovas was malingering for secondary gain. *Id.* Dr. Wilson determined that a pulmonary consult was advisable to determine through differential diagnosis whether Mr. Kadamovas had the symptoms he described. *Id.*

On May 6, 2016, Mr. Kadamovas was seen by an outside pulmonologist, Dr. Bhuptani. *Id.* Mr. Kadamovas reported shortness of breath and tightness in his chest when exposed to smoke or a strong smell. *Id.* at 6. Dr. Bhuptani performed a pulmonary function test, which showed no obstruction, lack of bronchodilator response, no restriction and no air trapping. *Id.* Dr. Bhuptani's treatment recommendation was to stop Symbicort due to an alleged allergic reaction and prescribe Proventil HFA aerosol (2 puffs inhaled 4 times daily), continue Singulair and Albuterol, and follow-up in six months. *Id.* Dr. Bhuptani also recommended that medical staff "consider bronchodilators" "[i]f asthma is clinically suspected." *Id.*

On June 26, 2016, Mr. Kadamovas was evaluated by a registered nurse for complaints of shortness of breath. *Id.* at 6. The nurse found him in no apparent distress with no significant findings. When the nurse arrived, Mr. Kadamovas was upright and ambulatory with a steady gait, clear and concise speech, and no labored breathing.

On January 19, 2017, Dr. Wilson conducted a chronic care evaluation of Mr. Kadamovas. *Id.* at 7. Mr. Kadamovas complained that a sewage back-up affected his breathing. *Id.* Dr. Wilson noted that Mr. Kadamovas had been seen by a pulmonologist and diagnosed with mild persistent asthma, and his chest x-ray was negative within the past three years. *Id.* Mr. Kadamovas also told

Dr. Wilson that he develops tachycardia, an abnormally rapid heart rate, when he uses the Albuterol inhaler.

On February 11, 2017, Mr. Kadamovas was evaluated by a registered nurse to follow up on his complaints that smoke was making him short of breath. *Id.* at 7. When she arrived at his cell, the nurse observed that he was sitting in his cell writing. His respiration was easy and he had no cough. However, Mr. Kadamovas appeared to become anxious and upset when he discussed his breathing and smoke/fires. He also complained of a headache. The on-call provider was notified, and a new order of Clonidine 0.1mg was received. *Id.*

Mr. Kadamovas complained to medical staff about smoke again on June 3, 2017. *Id.* at 8. He complained to a registered nurse that "they are smoking something and its raised my blood pressure." When the nurse arrived at his cell, he was in no apparent distress and was speaking in full sentences. His respirations were easy and lungs were clear, but his blood pressure was elevated. Mr. Kadamovas was given an Albuterol nebulizer and he appeared less anxious and his blood pressure dropped. He reported he felt better and was ready to go back to his cell.

Mr. Kadamovas was seen for a follow-up visit by outside pulmonologist Dr. Bhuptani on July 10, 2017. *Id.* at 8. Mr. Kadamovas complained that exposure to pressure spray "spread on others" bothered his asthma. Dr. Bhuptani continued Proventil, Atrovent, and mometasone, recommended that Mr. Kadamovas avoid exposure to OC spray as possible, and directed him to come back in one year for a follow-up appointment. Dkt. No. 92-8 at 37-38.

In November 2017, Dr. Wilson saw Mr. Kadamovas for his chronic care visit. Dkt. No. 92-4 at 8. Dr. Wilson found Mr. Kadamovas in no apparent distress and his lungs were clear. *Id.* Dr. Wilson spoke with Executive Staff about trying to ensure that exhaust fans are used in the SHU before pepper gas is administered. *Id.*

## C. Expert Opinion of Dr. John Buckley

Dr. John Buckley is a Medical Doctor who also has a Masters in Public Health. Dkt. No. 92-11. He is a practicing pulmonologist who is Board-certified in Pulmonary Medicine, Internal Medicine, and Critical Care Medicine. *Id.* He is currently the Vice Chair for Education, Department of Medicine, at the Indiana University School of Medicine. *Id.* Dr. Buckley is also a Service Line Co-Leader in Pulmonary/Critical Care/Sleep Medicine at Indiana University Health Physicians. *Id.*

Dr. Buckley was retained by the defendants to review Mr. Kadamovas' complaints and the BOP's medical care of his asthma and breathing problems. Based on his review of the record, Dr. Buckley determined that, he believes that Mr. Kadamovas' breathing was irritated by smoke based on Mr. Kadamovas' consistent complaints over an extended period of time. Dkt. No. 92-10. According to Dr. Buckley, Mr. Kadamovas' medical examinations did not reveal wheezing or other physical symptoms consistent with asthma. Moreover, Mr. Kadamovas' pulmonary function test was not consistent with asthma. Nevertheless, Mr. Kadamovas has been treated with "optimal medical theory" for asthma through inhaled bronchodilators and inhaled corticosteriods, which Dr. Buckley opined as "medically appropriate and within the standard of care."

## D. Security Precautions in the USP-TH SHU to Prevent Fires

The SHU custodial staff at USP-TH have taken multiple steps to ensure inmate and staff safety and to prevent SHU inmates from setting fires. *See generally* Dkt. No. 92-12. SHU staff have removed all unnecessary paper and flammable items from the inmates' cells. *Id.* ¶ 5. Staff have also removed batteries and other items which inmates can use to ignite any paper which may still be in their cells. While it is impossible to remove all items that may be used to start a fire from the inmates, all available precautions have been taken to reduce the occurrence of this hazard.

For example, correctional staff frequently perform cell searches or shakedowns in an effort to locate contraband items, including items that may be used to start a fire. Correctional staff also perform routine pat-down searches of inmates to determine whether they possess contraband.

SHU inmates also have limits on the commissary items they are permitted to purchase and maintain as compared to inmates in the general population of the Federal Correctional Complex[5] (FCC-TH) at Terre Haute. *Id.* ¶ 7. These limits have been imposed as a deterrent on inmate "stores" and to help eliminate excess property items and nuisance contraband in housing units.

When an inmate does set a fire, the fire is extinguished as quickly as possible and the inmate is disciplined. *Id.* ¶¶ 3, 8. If any residual smoke comes up into the SCU, the affected inmates are removed from their cells and, if necessary, evaluated by medical staff. *Id.* ¶ 3. Moreover, the air handlers are reversed to remove smoke from the SHU and the SCU, and the air removal only takes a few minutes. *Id.* ¶ 4; *see also id.* at 4 (March 27, 2017, response to Attempt at Informal Resolution) (confirming that SHU is conducting shakedowns and confiscating batteries and SHU inmates will not be permitted to possess batteries).

### E. Defendants

#### 1. Former Warden John Caraway, Former Warden Charles Daniels, Warden Jeffrey Krueger

John Caraway was the Complex Warden at FCC-TH from August 26, 2012, until January 10, 2015. *See* Dkt. No. 92-13. He has not worked at FCC-TH since January 2015, nor has he had any decision-making authority over FCC-TH since January 2015. Charles Daniels was the

---

[5] The Federal Correctional Complex at Terre Haute (FCC-TH) is comprised of USP-TH, a high security U.S. penitentiary, (https://www.bop.gov/locations/institutions/thp/), Federal Correctional Institute Terre Haute, a medium security federal correctional institution (https://www.bop.gov/locations/institutions/tha/), and Federal Prison Camp Terre Haute, a minimum security satellite camp (*id.*).

Complex Warden at FCC-Terre Haute from February 22, 2015, until his retirement on December 31, 2016. *See* Dkt. No. 92-14. Since March 2017, Jeffrey Krueger has been the Complex Warden at FCC-Terre Haute. *See* Dkt. No. 92-2.

As Complex Wardens at the FCC-TH, Warden Caraway, Daniels, and Krueger delegated the day-to-day tasks related to safety and security of inmates to his staff. The day-to-day operations in the SHU were run by a Captain, who reported to an Associate Warden. The Captain oversaw the Lieutenants and Correctional Officers, who were responsible for safety and security within the SHU, including moving the inmates, searching the cells and "policing" type activities. During their respective time as Warden, Wardens Caraway, Daniels, and Krueger conducted rounds in the Institution, during which they talked to inmates and staff about any issues in the units. Wardens Caraway, Daniels, and Krueger were aware that their correctional staff would regularly conduct cell searches, "shake-downs" of housing cells, and pat searches of inmates to ensure that the inmates did not have contraband, including contraband that may be used to start fires. Wardens Caraway, Daniels, and Krueger were also aware that inmates who were found to have violated the prison's code of conduct (including the possession of contraband or starting fires) would be written an Incident Report and appropriate disciplinary steps would be taken.

Wardens Caraway, Daniels, and Krueger were not involved in the decision by the BOP to place Mr. Kadamovas in the SCU at USP-TH. The SCU is the only "death row" in the federal prison system.[6] Accordingly, for security purposes, there are no windows in the SCU that open and close.

---

[6] Mr. Kadamovas is a death row inmate because he is serving a death sentence for four counts of conspiracy to take hostages resulting in death, in violation of 18 U.S.C. § 1203. *See United States v. Mikhel, et al.*, No. 2:02-cr-00220-DT-2 (C.D. Cal.), Dkt. No. 1641.

### 1. Former Warden John Caraway

In February 2014, Warden Caraway responded to a grievance from Mr. Kadamovas alleging that SHU inmates were burning things in their cells. Dkt. No. 92-13 at 5. Former Warden Caraway confirmed that anytime a staff member observed a SHU inmate starting a fire or heating up a food item, the inmate received an Incident Report for violating Code 103, Setting a Fire. In October 2014, former Warden Caraway also responded to an email from Mr. Kadamovas regarding smoke, gas, and dust traveling through the air vent system. *Id.* at 6. Warden Caraway confirmed that the air filters were changed approximately every 6-8 weeks, more frequently than required by the minimum standards of twelve weeks.

### 2. Former Warden Charles Daniels

In May 2015, and January 2016, Warden Daniels responded to letters from the Lithuanian Embassy written on behalf of Mr. Kadamovas regarding second-hand exposure to gas and smoke from the SHU. Dkt. No. 92-14 at 5,7. Warden Daniels confirmed that he had reviewed the matter and the Facilities Department was changing the air filters approximately every four to six weeks, even though the minimum standard for air filter replacement is twelve weeks. Warden Daniels also confirmed based on medical records that Mr. Kadamovas was not showing signs of respiratory distress and received a clear chest x-ray.[7]

Warden Daniels responded in January 2016 to a letter from Mr. Kadamovas' attorney addressing concerns about Mr. Kadamovas' exposure to OC spray. *Id.* at 6. In the response, Warden Daniels noted that every effort was made to limit and mitigate Mr. Kadamovas' exposure to OC spray when it was used in the SHU, that the vents between the SHU and SCU are closed off

---

[7] The defendants also refer to October 5, 2015, and January 15, 2016, emails from Warden Daniels to Mr. Kadamovas, *see* Dkt. No. 93 at 12-13, but no such emails were submitted to the Court.

when OC spray is used, and that the air filters in those units are changed more frequently than recommended to reduce any residual contamination.

### 3.    Warden Jeffrey Krueger

Warden Krueger is aware of steps that his staff have taken to limit any exposure Mr. Kadamovas may have to smoke or gas coming from the SHU.  *See* Dkt. No. 92-2.  These steps include moving Mr. Kadamovas to an upper-tier cell; attempting to remove Mr. Kadamovas from his cell when OC spray fumes were detected in the SCU; shutting off or reversing vent flow when OC spray is used in the SHU; and changing the air filters between the two units more frequently than is required by the minimum standards.

In April 2017, Warden Krueger responded to a letter from the Lithuanian Embassy written on behalf of Mr. Kadamovas regarding second-hand exposure to smoke from the SHU.  Dkt. No. 92-2 at 5.  Warden Krueger confirmed that he had reviewed the matter and explained that while every effort is made to limit and mitigate inadvertent inmate exposure to smoke and OC spray when it is used for security reasons, it is impossible to ensure no other inmate or staff would be tangentially affected.  He also explained the vents between the SHU and SCU would be closed off to limit the air moving between the two units and that the air filters were changed more frequently than recommended.  Finally, Warden Krueger confirmed that he reviewed Mr. Kadamovas' medical record, which indicated he was last seen on February 11, 2017, for complaint of smoke that made him short of breath, but that the staff did not note any visible smoke or smell any smoke and no chemical agents had been used recently.

Warden Krueger cannot move Mr. Kadamovas to another housing unit because of his death row designation, and cannot move Mr. Kadamovas to a cell with windows that open and close because no such cells exist in the SCU.  *Id.* ¶ 8.

### 2. Former Unit Managers Melissa Bayless and Micheal Sample

Melissa Bayless served as the SCU Unit Manager at FCC-TH from December 16, 2012, until October 11, 2014. Dkt. No. 92-15. As SCU Unit Manager, Ms. Bayless had no day-to-day control over the security of or custodial care of the inmates housed in the SHU, and had no decision-making authority over the SHU. She did not have the ability to restrict or control the contraband in the SHU, the frequency with which fires occurred in the SHU, nor the frequency with which OC spray was deployed.

Micheal Sample served as the SCU Unit Manager at FCC-TH from December 2014, through December 2015. As SCU Unit Manager, Mr. Sample had no day-to-day control over the security of or custodial care of the inmates housed in the SHU, and had no decision-making authority over the SHU. He did not have the ability to restrict or control the contraband in the SHU, the frequency with which fires occurred in the SHU, nor the frequency with which OC spray was deployed. Mr. Sample also had no decision-making authority regarding the decision to place Mr. Kadamovas in the SCU of USP-TH. When Mr. Kadamovas complained about exposure to smoke and gas, Mr. Sample moved him to the upper tier of the SCU in an effort to reduce the potential exposure.

Mr. Sample allegedly pulled Mr. Kadamovas "into the building when it was full of the gas when [he] was actually asking to not to do so," Dkt. No. 92-1 at 96-97, and prevented Mr. Kadamovas from closing his ventilation system when gas and smoke are present. *Id.* Mr. Sample asserts that neither SCU inmates or staff have access to the SCU ventilation system and are unable to manipulate the SCU ventilation system. Dkt. No. 99-1 at 1. Only BOP Facilities staff have the ability to close or open the ventilation system between the SCU and SHU. *Id.* Mr. Sample further

disputes that he pulled Mr. Kadamovas back into the building when it was full of gas, but that if he had done so, he would have been exposed to the same gas or fumes. *Id.* at 1-2.

### 3. Clinical Director Dr. William Wilson

Dr. William Wilson is a Medical Doctor who is employed by the BOP as Clinical Director of FCC–TH. Dkt. No. 92-3. As Clinical Director, Dr. Wilson facilitates the medical care and treatment of the inmates housed at FCC-TH, but is not involved in and has no control over the operations of the SHU or the SCU. He has no day-to-day control over the security of or custodial care of the inmates housed in the SHU or SCU. He also has no decision-making authority over the SHU or SCU, nor the ability to restrict or control the introduction of contraband in the SHU, the frequency with which fires occurred in the SHU, nor the frequency with which OC is deployed in the SHU.

Dr. Wilson has informed the Executive Staff that steps should be taken to ensure that Mr. Kadamovas is not directly exposed to smoke and gas (i.e., that OC spray is not used directly on Mr. Kadamovas). *Id.* ¶ 6. It is Dr. Wilson's understanding that staff are taking those steps to the extent possible. Dr. Wilson has no information that Mr. Kadamovas is being exposed to levels of smoke or gas that are triggering an "asthma attack" or respiratory distress. It is Dr. Wilson's medical opinion that Mr. Kadamovas has not exhibited any physical signs of an asthma attack or respiratory distress when evaluated by medical staff at any point in time.

### III. Discussion

Mr. Kadamovas alleges that the defendants were deliberately indifference to his serious medical needs of asthma and breathing problems under the Eighth Amendment. Mr. Kadamovas argues that the defendants should have done more to protect him from exposure to OC spray and smoke. *See* Dkt. No. 96 at 3-5. Specifically, former Warden Caraway should have implemented

a policy or recommendation at FCC-TH that would have required prison officials in contact with Mr. Kadamavas to pull him out of his cell before chemical agents were used. *See* Dkt. No. 92-1 at 88. Further, Former Warden Caraway failed to "implement some policy that [would] prevent inmates to pass[] and receiv[e] contraband." *Id*. at 88. The FCC Terre Haute, Indiana, A&O Handbook provided that inmates "have the right to safe, clean and healthy environment including smoke-free living area." *Id*. at 88. Former Warden Daniels failed to ensure that Mr. Kadamavas had "safe, clean and healthy environment, including smoke-free living area." *Id*. at 92-9. Warden Krueger also failed to ensure that Mr. Kadamavas had a safe, clean and healthy environment. *See id.* at 94. Mr. Kadamavas argues that Dr. Wilson should have permitted him to see a pulmonologist sooner. Dkt. No. 92-1 at 101.

The defendants seek summary judgment on all Eighth Amendment claims against them. Dkt. No. 92. The defendants first argue that any claims accruing before January 14, 2014, are time-barred. Dkt. No. 93 at 18-19. Next, the defendants argue they were not deliberately indifferent because Mr. Kadamavas does not suffer from a serious medical need and the defendants were not deliberately indifferent to his medical condition. Rather, the defendants assert that they have actively taken steps to ensure Mr. Kadamavas' exposure to smoke or OC spray is limited. Finally, the defendants argue they are entitled to qualified immunity.

In response, Mr. Kadamavas argues his claims are not time-barred, he suffers from a serious medical condition, and that the defendants (except for Ms. Bayless) were deliberately indifferent and are not entitled to qualified immunity. Dkt. No. 96.

In reply, the defendants note that Mr. Kadamavas has not disputed the statement of material facts they presented. Dkt. No. 99 at 2. The defendants also argue that Mr. Kadamavas' "facts" are merely his opinions and are insufficient to preclude summary judgment in their favor.

## A.    Statute of Limitations

The defendants argue that any claims accruing before January 14, 2014, are time-barred. Dkt. No. 93 at 18-19.  The defendants assert that "if his claim is that the Defendants caused him to be exposed to second-hand smoke and gas between 2012 and February 1, 2015, it is barred by the Indiana two-year statute of limitations."  *Id.* at 18 (citing *Wilson v. Garcia*, 471 U.S. 261, 280 (1985)).  The defendants assert, however, that "claims made after his administrative remedy was submitted on January 14, 2014, were tolled while it was being processed."  *Id.* at 19.  In response, Mr. Kadamovas argues his claims are not time-barred because his action does not accrue until his administrative grievance is exhausted.

The statute of limitations in a *Bivens* claim is the same as that for a claim brought pursuant to 42 U.S.C. § 1983.  *See Lewellen v. Morely*, 875 F.2d 118, 119 (7th Cir. 1989); *Bieneman v. City of Chicago*, 864 F.2d 463, 469 (7th Cir. 1988).  In these cases, "federal courts apply the statute of limitations governing personal injury actions in the state where the injury took place."  *Serino v. Hensley*, 735 F.3d 588, 590 (7th Cir. 2013).  "In Indiana, such claims must be brought within two years."  *See Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); Ind. Code § 34–11–2–4.  "But federal law determines when that statute begins to run."  *Serino*, 735 F.3d at 590.  *Bivens* and § 1983 claims "accrue when the plaintiff knows or should know that his or her constitutional rights have been violated."  *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006).  The Court conducts a two-part inquiry to determine when this standard is met: "First, a court must identify the injury. Next, it must determine the date on which the plaintiff could have sued for that injury."  *Id.* However, an Eighth Amendment violation arising out of a defendant's deliberate indifference to a prisoner's medical needs can be a continuing violation and can accrue for as long as a defendant

knows about a prisoner's serious medical condition, has the power to provide treatment, and yet withholds treatment. *Heard v. Sheahan*, 253 F.3d 316, 318-20 (7th Cir. 2001).

In this case, the complaint was filed on February 1, 2017. However, the complaint alleges an Eighth Amendment violation arising out of the defendants' alleged deliberate indifference to Mr. Kadamovas' medical needs over the course of several years. However, the question would turn on whether the defendants knew about Mr. Kadamovas' "serious" medical condition, had the power to provide treatment, and withheld treatment. *Id.* Resolution of the statute of limitations question requires analysis of Mr. Kadamovas' constitutional claims and whether treatment was "withheld."

At this juncture, neither party has provided any briefing addressing this issue. Because the issues in this case can be resolved on other grounds, in the interest of judicial economy, the Court will bypass the question of statute of limitation and address the merits of Mr. Kadamovas' claims. *See Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008) ("We may affirm summary judgment on any basis supported in the record. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 681 (7th Cir. 2007)("Like the district court, we will bypass the statute of limitations questions and consider the merits of Klebanowski's claims against the individual defendants.").

**B.    Eighth Amendment Deliberate Indifference Standard**

At all times relevant to Mr. Kadamovas' claims, he was a convicted inmate. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). Pursuant to the Eighth Amendment, prison officials have a duty to provide

humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). A successful § 1983 plaintiff must also establish not only that a state actor violated his constitutional rights, but that the violation caused the plaintiff injury or damages. *Roe v. Elyea*, 631 F.3d 843, 846 (7th Cir. 2011) (citation omitted).

"[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotations omitted).

The Seventh Circuit has held that non-medical personnel who review an inmate's grievances and verify with medical officials that the inmate was receiving treatment are not deliberately indifferent. *See Hayes v. Snyder*, 546 F.3d 516, 526-27 (7th Cir. 2008) (citing *Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005)). The Court further explained, "'[i]f a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'" *Id.* at 527 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). "The policy supporting the presumption that non-medical officials are

entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one." *Id.*

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). "Under the Eighth Amendment, [a plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

### C. Objectively Serious Medical Need

Mr. Kadamovas asserts that his asthma is a "serious" medical need. *See* Dkt. No. 96 at 2. In support, he states that he has been diagnosed with asthma, has been prescribed various medications for his asthma, and has a standing medical note that he is to avoid exposure to OC spray. He also testifies that his reaction when exposed to smoke or gas is "extreme." *Id.* at 2-3. The defendants disagree, arguing that although medical providers have prescribed medication and

diagnosed him with "mild, persistent asthma" based on his subjective word, Mr. Kadamovas has never exhibited signs of an asthma attack or respiratory distress. Additionally, there are no objective medical signs through pulmonary function testing, CT scans, or chest x-rays that show that Mr. Kadamovas suffers from asthma. *See* Dkt. No. 93 at 21-22.

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotations and citations omitted). A medical condition that causes pain can be serious without being life-threatening, *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (finding muscle spasms and accompanying back pain objectively serious), but "this is not to say, however, that every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim," *Gutierrez*, 111 F.3d at 1372. As the Seventh Circuit explained,

> Deliberately [] ignor[ing] a request for medical assistance has long been held to be a form of cruel and unusual punishment, but this is provided that the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized. A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue--the sorts of ailments for which many people who are not in prison do not seek medical attention--does not by its refusal violate the Constitution. The Constitution is not a charter of protection for hypochondriacs. But the fact that a condition does not produce "objective" symptoms does not entitle the medical staff to ignore it. … Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition.

*Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996) (internal citations omitted). Of relevance is the state of mind of the prison officials – even if an injury may later turn out to not be serious, if the injuries *appear* to be serious, prompt medical attention must be provided. *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991).

Relevantly, on two prior occasions, the Seventh Circuit has held that mild asthma and breathing problems from exposure to second-hand smoke were not objectively serious medical needs. In *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999), the Seventh Circuit held that breathing problems, chest pains, dizziness, sinus problems, headaches, and a loss of energy as a result of exposure to second-hand smoke was not an objectively serious injury or medical need that amounts to a denial of "the minimal civilized measure of life's necessities." Similarly, in *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996), the Seventh Circuit held that a mild case of asthma, which was exacerbated by second-hand tobacco smoke, did not rise to the level of seriousness sufficient to support a claim for relief.

Mr. Kadamovas attempts to distinguish his condition from *Henderson* and *Oliver*, arguing that Mr. Henderson was not diagnosed with a medical condition or ailment brought about by his exposure to second-hand smoke and Mr. Oliver's asthma was not so serious as to require a separate cell from nonsmokers. *See* Dkt. No. 96 at 8-9. The Court does not find these differences compelling. In *Oliver*, Mr. Oliver was asthmatic and showed sign of distress when exposed to smoke. *Oliver*, 77 F.3d at 160. However, the Seventh Circuit found that:

> Mr. Oliver's medical records show that he received considerable medical attention for asthma concerns, as well as for other ailments. He never required outside hospitalization, and he even missed a few appointments he had with the medical staff regarding his asthma. Uniformly, the medical records evaluate his asthma as only a mild case. He was given medication and an inhaler. He does not dispute that the medication and the inhaler were a proper medical response to his condition.

*Id.* Mr. Oliver requested that he be housed with a nonsmoker, but the Seventh Circuit rejected his claim, arguing that "'the Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration.' Mr. Oliver's complaint seeks to involve us in the sort of 'micromanagement' of a state prison that we deplored in *Anderson*." *Id.* at 161 (citing *Anderson v. Romero*, 72 F.3d 518 (7th Cir. 1995)).

The Court finds *Oliver* to be instructive.  Like *Oliver,* Mr. Kadamovas has been diagnosed with mild, persistent asthma and prescribed inhalers and various other medications.  However, Mr. Kadamovas has never been shown to have asthma through objective medical testing such as through pulmonary function testing, chest x-ray, or CT scans, nor has Mr. Kadamovas ever exhibited any signs of asthma attack or respiratory distress when seen by USP-TH medical staff.  Nor does Mr. Kadamovas allege that he has ever suffered an asthma attack.

The only evidence of Mr. Kadamovas' condition from exposure from gas or smoke is his testimony that he has breathing problems, diarrhea, vomiting, crying, sneezing, psychological anguish, headache, fear of death, high blood pressure, accelerated heartbeat, respiratory stress, wheezing, chest pains, and excessive sweating.  But these are, objectively speaking, relatively minor.  *See Henderson*, 196 F.3d at 846 ("the injuries of which Henderson complains--breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy--are, objectively speaking, relatively minor"); *Gayton v. McCoy*, 593 F.3d 610, 921 (7th Cir. 2010) ("Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances (e.g., vomiting continuously for a long period of time, having blood in one's vomit, or the like), does not amount to an objectively serious medical condition.").  Moreover, as in *Oliver*, Mr. Kadamovas fails to show "there is a causal relationship between the smoke and the distress [he] suffered." *Oliver*, 77 F.3d at 160.  Additionally, symptoms like high blood pressure, accelerated heartbeat, and excessive sweating is likely a consequence of psychological anguish Mr. Kadamovas brought upon himself while thinking about smoke and gas.  For example, in one medical encounter, Mr. Kadamovas was calm and writing in his cell when the nurse first arrived but became agitated and anxious when discussing the smoke.  *See* Dkt. No. 92-8 at 8.

Although exposure to unwanted OC spray and smoke fumes is generally undesired, no reasonable jury would find that Mr. Kadamovas' asthma and breathing problems were an "objectively serious" medical need. Accordingly, summary judgment for the defendants is warranted on this ground.

Even if the Court were to assume, for purposes of argument only, that Mr. Kadamovas has indeed established an objectively serious medical need, Mr. Kadamovas still needs to demonstrate that defendants were deliberately indifferent to that need, which is explained in more detail below.

**D.      Claim against Former Warden John Caraway**

Mr. Kadamovas argues that former Warden Caraway was deliberately indifferent to his serious medical needs by failing to implement a policy or recommendation at FCC-TH that would have required prison officials in contact with Mr. Kadamovas to pull him out of his cell before chemical agents were used, and that would prevent inmates from passing contraband and starting fires. *See* Dkt. No. 59 at 4-5.

First, as explained above in Section III(C), the Court has determined that Mr. Kadamovas' asthma and breathing problems were not an objectively serious medical need. Moreover, Mr. Kadamovas has failed to show that Warden Caraway disregarded the risk to Mr. Kadamovas' health. Rather, the evidence reflects that Warden Caraway ensured that his staff took steps to prevent SHU inmates from starting fires and smoking, including by conducting rounds, regularly conducting cell searches and "shake-downs" of housing cells, and pat searching inmates to ensure that the inmates did not have contraband, including contraband that may be used to start fires. Warden Caraway also was aware that inmates who were found to have violated the prison's code of conduct (including the possession of contraband or starting fires) would receive an Incident Report and appropriate disciplinary steps would be taken. Warden Caraway was also aware that

SHU inmates were placed on limited commissary privileges and are not permitted to make certain purchases, such as batteries, which can be used to ignite fires. Additionally, Warden Caraway took steps to ensure that Mr. Kadamovas had limited exposure to OC spray, including having the air filters between the SHU and the SCU changed more frequently than recommended in order to remove the possibility of residual particles.

Finally, Warden Caraway reviewed Mr. Kadamovas' medical records and confirmed he was receiving treatment and was therefore entitled to rely on professional judgment of the facility's medical staff. *See Hayes*, 546 F.3d at 526-27.

In short, the evidence reflects that Warden Caraway took constitutionally adequate steps to ensure that Mr. Kadamovas received appropriate medical care and was limited in his exposure to smoke and OC gas. Accordingly, summary judgment for Warden Caraway is warranted.

### E. Claim against Former Warden Charles A. Daniels

Mr. Kadamovas argues that former Warden Daniels was deliberately indifferent to his serious medical needs by failing to prevent inmates from starting fires by not effectively enforcing policies and procedures which would prevent such acts. *See* Dkt. No. 59 at 5.

First, as explained above in Section III(C), the Court has determined that Mr. Kadamovas' asthma and breathing problems were not an objectively serious medical need. Moreover, Mr. Kadamovas has failed to show that Warden Daniels disregarded the risk to Mr. Kadamovas' health. Rather, the evidence reflects that Warden Daniels ensured that his staff took steps to prevent SHU inmates from starting fires and smoking, including by conducting rounds, regularly conducting cell searches and "shake-downs" of housing cells, and pat searching inmates to ensure that the inmates did not have contraband, including contraband that may be used to start fires. Warden Daniels also was aware that inmates who were found to have violated the prison's code of conduct

(including the possession of contraband or starting fires) would receive an Incident Report and appropriate disciplinary steps would be taken. Warden Daniels was also aware that SHU inmates were placed on limited commissary privileges and are not permitted to make certain purchases, such as batteries, which can be used to ignite fires. Additionally, Warden Daniels took steps to ensure that Mr. Kadamovas had limited exposure to OC spray, that every effort was made to mitigate his exposure to OC spray when it was used in the SHU, that the vents between the SHU and SCU are closed off when OC spray is used, and that the air filters in those units are changed more frequently than recommended to reduce any residual contamination.

Furthermore, Warden Daniels reviewed Mr. Kadamovas' medical records and confirmed he was receiving treatment and was therefore entitled to rely on professional judgment of the facility's medical staff. *See Hayes*, 546 F.3d at 526-27.

In short, the evidence reflects that Warden Daniels took constitutionally adequate steps to ensure that Mr. Kadamovas received appropriate medical care and was limited in his exposure to smoke and OC gas. Accordingly, summary judgment for Warden Daniels is warranted.

### F.     Claim against Warden Jeffrey E. Krueger

Mr. Kadamovas argues that Warden Krueger was deliberately indifferent to his serious medical needs by failing to prevent inmates from starting fires by not effectively enforcing policies and procedures which would prevent such acts. *See* Dkt. No. 59 at 6-7.

First, as explained above in Section III(C), the Court has determined that Mr. Kadamovas' asthma and breathing problems were not an objectively serious medical need. Moreover, Mr. Kadamovas has failed to show that Warden Krueger disregarded the risk to Mr. Kadamovas' health. Rather, the evidence reflects that Warden Krueger ensured that his staff took steps to prevent SHU inmates from starting fires and smoking, including by conducting rounds, regularly

conducting cell searches and "shake-downs" of housing cells, and pat searching inmates to ensure that the inmates did not have contraband, including contraband that may be used to start fires. Warden Krueger also was aware that inmates who were found to have violated the prison's code of conduct (including the possession of contraband or starting fires) would receive an Incident Report and appropriate disciplinary steps would be taken. Warden Krueger was also aware that SHU inmates were placed on limited commissary privileges and were not permitted to make certain purchases, such as batteries, which can be used to ignite fires. Additionally, Warden Krueger is aware of steps that his staff have taken to limit any exposure Mr. Kadamovas may have from smoke or gas coming from the SHU, including moving Mr. Kadamovas to an upper-tier cell; attempting to remove Mr. Kadamovas from his cell when OC spray fumes were detected in the SCU; shutting off or reversing vent flow when OC spray is used in the SHU; and changing the air filters between the two units more frequently than is required by the minimum standards.

Furthermore, Warden Krueger reviewed Mr. Kadamovas' medical records and confirmed he was receiving treatment and was therefore entitled to rely on professional judgment of the facility's medical staff. *See Hayes*, 546 F.3d at 526-27.

In short, the evidence reflects that Warden Krueger took constitutionally adequate steps to ensure that Mr. Kadamovas received appropriate medical care and was limited in his exposure to smoke and OC gas. Accordingly, summary judgment for Warden Krueger is warranted.

## G.    Claim against Former Unit Manager Melissa Bayless

Mr. Kadamovas argues that former Unit Manager Melissa Bayless was deliberately indifferent to his serious medical needs by failing to protect him from exposure to smoke and OC spray. *See* Dkt. No. 59 at 6-7.

First, as explained above in Section III(C), the Court has determined that Mr. Kadamovas'

asthma and breathing problems were not an objectively serious medical need. Moreover, Mr.

Kadamovas has failed to show that Unit Manager Bayless was personally involved in any

constitutional deprivation. "Individual liability under § 1983… requires personal involvement in

the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir.

2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)

("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An

individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged

constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct

complained of and the official sued is necessary.")). Mr. Kadamovas alleges that Ms. Bayless

failed to do more to protect him from exposure to smoke and OC spray from the SHU, but Ms.

Bayless had no day-to-day control over the security of or custodial care of the inmates housed in

the SHU and had no decision-making authority over the SHU. She did not have the ability to

restrict or control the contraband in the SHU, the frequency with which fires occurred in the SHU,

nor the frequency with which OC spray was deployed.

In his reply, Mr. Kadamovas did not refute Ms. Bayless' contention that she was not

personally involved in the alleged violation of his constitutional rights. *See* Dkt. No. 96.

Accordingly, summary judgment for Ms. Bayless is warranted.

### H.    Claim against Former Unit Manager Micheal V. Sample

Mr. Kadamovas argues that former Unit Manager Micheal V. Sample was deliberately

indifferent to his serious medical needs by failing to protect him from exposure to smoke and OC

spray. *See* Dkt. No. 59 at 7. Mr. Sample also allegedly pulled Mr. Kadamovas "into the building

when it was full of the gas when [he] was actually asking to not to do so," Dkt. No. 92-1 at 96-97,

and prevented Mr. Kadamovas from closing his ventilation system during exposure to gas and smoke. *Id.*

First, as explained above in Section III(C), the Court has determined that Mr. Kadamovas' asthma and breathing problems were not an objectively serious medical need. Moreover, Mr. Kadamovas has failed to show that Unit Manager Sample was personally involved in any constitutional deprivation. "Individual liability under § 1983… requires personal involvement in the alleged constitutional deprivation." *Colbert*, 851 F.3d at 657 (internal quotation omitted) (citing *Wolf-Lillie*, 699 F.2d at 869 ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")). Mr. Kadamovas alleges that **Mr. Sample** failed to do more to protect him from exposure to smoke and OC spray from the SHU, but **Mr. Sample had no day-to-day control over the security of or custodial care of the inmates housed in the SHU and had no decision-making authority over the SHU.** He did not have the ability to restrict or control the contraband in the SHU, the frequency with which fires occurred in the SHU, nor the frequency with which OC spray was deployed. Although Mr. Sample allegedly prevented Mr. Kadamovas from closing his ventilation system during exposure to gas and smoke, SCU inmates and staff do not have access to the SCU ventilation system and are unable to manipulate the SCU ventilation system.

Even if Mr. Sample was personally involved, Mr. Kadamovas fails to show Mr. Sample disregarded the risk to Mr. Kadamovas' health. When Mr. Kadamovas complained about exposure to smoke and gas, Mr. Sample moved him to the upper tier of the SCU in an effort to reduce the potential exposure. Additionally, although Mr. Kadamovas identifies one instance where Mr.

Sample allegedly pulled Mr. Kadamovas "into the building when it was full of the gas when [he] was actually asking to not to do so," Dkt. No. 92-1 at 96-97, no reasonable jury would find that Mr. Kadamovas was injured from this isolated incident or that Mr. Sample was deliberately indifferent to Mr. Kadamovas' health where Mr. Sample would have been exposed to the same gas or fumes if that level of smoke or fumes was so dangerous. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996) (holding that to find deliberate indifference defendant must have committed an act so dangerous that his knowledge of the risk can be inferred); *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988) (finding that to show deliberate indifference, a plaintiff is required to prove that the prison official's action was deliberate or reckless in the criminal sense). Accordingly, summary judgment for Mr. Sample is warranted.

I.      **Claim against Clinical Director Dr. William E. Wilson**

Mr. Kadamovas argues that Clinical Director Dr. William E. Wilson was deliberately indifferent to his serious medical needs by denying his legitimate requests for procedures to protect him from the harm of tear gas and smoke. *See* Dkt. No. 59 at 7-8. In his deposition, he argued that Dr. Wilson should have permitted him to see a pulmonologist sooner. Dkt. No. 92-1 at 101.

First, as explained above in Section III(C), the Court has determined that Mr. Kadamovas' asthma and breathing problems were not an objectively serious medical need. Additionally, Mr. Kadamovas fails to show that Dr. Wilson was deliberately indifferent to his medical needs. Viewing the evidence in the light most favorable to Mr. Kadamovas, Mr. Kadamovas was regularly seen in a prompt manner by medical staff regarding his complaints of breathing problems. Despite no objective evidence supporting a diagnosis of asthma, including through CT scan and chest x-ray, Mr. Kadamovas was provided Albuterol inhalers and various medications and a note was placed in his file to restrict the use of chemical gas on him. Although Dr. Wilson requested a

consult with an outside pulmonologist in November 2014, the URC denied that request. Ultimately, Mr. Kadamovas was seen by an outside pulmonologist in May 2016, but Dr. Bhuptani found no obstruction, lack of bronchodilator response, no restriction and no air trapping in Mr. Kadamovas' lungs through a pulmonary function test. In 2017, Dr. Wilson spoke with Executive Staff about trying to ensure that exhaust fans are used in the SHU before pepper gas is administered.

The undisputed record reflects that Mr. Kadamovas received extensive medical care from Dr. Wilson and the medical staff. The defendants' expert, Dr. Buckley, opined that Mr. Kadamovas' care was "optimal," "medically appropriate[,] and within the standard of care." Dkt. No. 92-10.

Although Mr. Kadamovas asserts that Dr. Wilson inappropriately delayed in allowing him to see an outside pulmonologist, the evidence reflects that Dr. Wilson's request in 2014 for Mr. Kadamovas to see an outside pulmonologist was denied by the URC, and Mr. Kadamovas does not allege or set forth any evidence that Dr. Wilson had the authority to override that denial. Moreover, Mr. Kadamovas fails to show how he was injured in any delay in seeing a pulmonologist where Dr. Bhuptani provided no difference in diagnosis or treatment.

Prison doctors who try reasonable, though imperfect, approaches to address an inmate's symptoms, and eventually resolve the symptoms, do not violate the Eighth Amendment by omitting a different, possibly better approach. *See Proctor v. Sood*, 863 F.3d 563, 567–68 (7th Cir. 2017) (affirming entry of summary judgment for prison's doctors who, despite failing to order colonoscopy or endoscopy to diagnose inmate's abdominal pain, reasonably investigated inmate's pain in other ways); *Norfleet*, 439 F.3d at 396 (reversing district court's refusal to enter judgment in favor of prison doctor where, despite a possibly superior alternative treatment, doctor's

treatment of inmate was reasonable).  As explained above, Mr. Kadamovas "is not entitled to demand specific care.  [He] is not entitled to the best care possible.  [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]."  *Forbes*, 112 F.3d at 267.

Accordingly, summary judgment for Dr. Wilson is warranted.

### J.     Qualified Immunity

The defendants argue that to the extent Mr. Kadamovas' constitutional rights were violated or that the defendants personally acted with deliberate indifference towards him, they are all entitled to qualified immunity.

Qualified immunity protects government officials from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015).  Analysis of the qualified immunity defense requires a consideration of: (1) whether the plaintiff's constitutional rights were violated and (2) whether the right clearly established at the time.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

For the reasons explained above, there was no constitutional violation, *see Jackson v. Parker*, 627 F.3d 634, 635 (7th Cir. 2010); *Suarez v. Town of Ogden Dunes*, 581 F.3d 591, 595 (7th Cir. 2009), so a qualified immunity defense is not necessary. *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1057–58 (7th Cir. 2011).

## IV.     Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton*, 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operates effectively.

Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases, summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983).

Mr. Kadamovas has not identified a genuine issue of material fact as to his claims in this case and the defendants are entitled to judgment as a matter of law. Therefore, the defendants' motion for summary judgment, Dkt. No. 92, is **granted.**

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 12/6/18

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Distribution:

JURIJUS KADAMOVAS
21050-112
TERRE HAUTE - USP
TERRE HAUTE U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 33
TERRE HAUTE, IN 47808

Oni N. Harton
BARNES & THORNBURG LLP (Indianapolis)
oharton@btlaw.com

John R. Maley
BARNES & THORNBURG LLP (Indianapolis)
jmaley@btlaw.com

Ladene Ivone Mendoza
BARNES & THORNBURG, LLP (Indianapolis)
ladene.mendoza@btlaw.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov